UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
G.S. and D.S., individually and on behalf of S.S.,
A Student with a Disability,

                                        Plaintiffs,                    **OPINION & ORDER**

        - against -                                                      No. 19-CV-6508 (CS)

PLEASANTVILLE UNION FREE SCHOOL
DISTRICT,

                                        Defendant.
-------------------------------------------------------------x

Appearances:

Marion M. Walsh
Littman Krooks LLP
White Plains, New York
*Counsel for Plaintiffs*

Mark. C. Rushfield
Shaw, Perelson, May & Lambert, LLP
Poughkeepsie, New York
*Counsel for Defendant*

Seibel, J.

        Before the Court are the cross-motions for summary judgment of Plaintiffs G.S. and D.S.

(collectively, "Plaintiffs" or the "Parents"), (Doc. 23), and of Defendant Pleasantville Union Free

School District ("Defendant" or the "District"), (Doc. 31).  For the following reasons, Plaintiffs'

motion is GRANTED IN PART and DENIED IN PART, and Defendants' motion is GRANTED

IN PART and DENIED IN PART.

I.      **BACKGROUND**

        The following facts are based on the parties' Local Civil Rule 56.1 Statements, (Doc. 25

("Ps' 56.1"); Doc. 33 ("D's 56.1")), their responsive 56.1 Statements, (Doc. 26 ("Ps'. 56.1

Resp."); Doc. 39 ("D's 56.1 Resp."), and the administrative record,[1] and are undisputed unless otherwise noted.[2]

### A.   Facts

#### 1.   Kindergarten Through Tenth Grade

Plaintiff's daughter, S.S., was born in May 2000, (Ps' 56.1 Resp. ¶ 1), and started attending public school in the District in kindergarten, (D's 56.1 Resp. ¶ 1).  The District designated S.S. as a "student with a disability" starting at that time, and in middle school through the tenth grade, the District provided S.S. with special education in its "Individual Support Program," or "ISP."  (Ps' 56.1 Resp. ¶ 2.) The ISP includes some special education classes, but students in the program are also in some classes with their same-aged peers.  (*See* Impartial

---

[1] The Court uses the exhibit designations used in the administrative record:  "Ps' Ex. _" and "D's Ex. _."  Because the District's exhibits are not paginated in a consistent way, all cites herein are to page numbers assuming the first page in every exhibit after the slip-sheet is page "1," and every subsequent page is consecutively paginated.

[2] After Plaintiffs filed their responsive 56.1 Statement, Defendant replied, (Doc. 36) – *i.e.*, supported anew its original Rule 56.1 Statement, by providing argument and citing to evidence that it did not cite in its original Statement, (*compare e.g.*, D's 56.1 ¶ 4 (citing to page 1078 of transcript), *with* Doc. 36 ¶ 1 (citing pages 238-39, 579-80, 678, 712, 1028, and 2275-76 of transcript)).  Local Rule 56.1 does not permit the filing of reply Rule 56.1 Statements.  *Capital Records, LLC v. Vimeo, LLC*, No. 09-CV-10101, 2018 WL 4659475, at *1 (S.D.N.Y. Sept. 10, 2018) ("Local Civil Rule 56.1 does not provide for a 'reply' in further support of a Rule 56.1 statement of undisputed facts.").  A reply Rule 56.1 Statement is "a procedurally improper attempt to have the last word in a manner that is not contemplated by the local rules."  *Killis v. Cabela's Retail II, Inc.*, No. 13-CV-6532, 2015 WL 128098, at *1 (N.D. Ill. Jan. 8, 2015) (rules substantively similar to the S.D.N.Y. Local Rules); *see Pape v. Dircksen & Talleyrand Inc.*, No. 16-CV-5377, 2019 WL 1435882, at *2-3 (E.D.N.Y. Feb. 1, 2019), *report and recommendation adopted*, 2019 WL 1441125 (E.D.N.Y. Mar. 31, 2019).  The Court is capable of determining whether Plaintiffs improperly disputed a fact without needing Defendant to file a procedurally improper document explaining as much.  Indeed, a reply 56.1 statement is particularly unnecessary where, as here, the Court is considering cross-motions, and thus Defendant had the opportunity to respond to Plaintiffs' statements.  Accordingly, the Court declines to consider Defendant's Reply Rule 56.1 Statement.  *See Lincoln Nat'l Life Ins. Co. v. TCF Nat'l Bank*, 875 F. Supp. 2d 817, 820 n.1 (N.D. Ill. 2012) (finding Reply Rule 56.1 Statements are inconsistent with burden-shifting Rule 56, highly unusual, and unauthorized under local rules).

Hearing Officer ("IHO") Decision at 3-4.) S.S. achieved "significant growth through the services of the District's ISP program through her eighth grade," and it is undisputed that the District provided appropriate special education services for S.S. through that year. (Ps' 56.1 Resp.¶ 3.)

The parties dispute, however, whether S.S. was successful in her ninth-grade year. (*Id.* ¶ 4; D's 56.1 Resp. ¶ 7.)3 At the administrative hearing before the IHO, D.S. testified that S.S. "didn't receive the support that she really needed and she was overwhelmed by regents level classes" during ninth grade, and she showed "some regression" as evidenced by her homework grades and report cards. (Tr. at 1974:8-1975:6.) Defendant notes, however, that S.S.'s ninth grade teacher testified at the hearing that S.S. had "a really good year," grew socially and academically, and "was successful in her classes." (*Id.* at 1028:14-18.) Further, D.S. sent a note to S.S.'s teachers thanking them for "for a great year" in which S.S. "made some great strides." (D's Ex. 14 at 15.) It is undisputed that S.S. was chronically late during that year, (D's 56.1 Resp. ¶ 8), which resulted in multiple detentions. (P's Ex. D at 4 (email from Rosemary Browne, ISP Program Coordinator at Pleasantville High School, stating that S.S. had accumulated three detentions "[d]ue to her latenesses").)

In April 2015, the District's Committee on Special Education ("CSE") met to develop an individualized education program ("IEP") for S.S.'s tenth-grade year. (D's 56.1 Resp. ¶ 11.)

> The IEP placed S.S. in a Special Class: 12:1+3:1 for Health/Life Science Instruction; Special Class: 15:1 for Modified Social Studies, Modified English and Modified Science. Further, the IEP provided that S.S. would receive [Consultant

---

3 In Defendant's 56.1 Statement, it states that S.S. "achieved success during her ninth grade," but cites to the index of the transcript of the hearing before the IHO. (D's 56.1 ¶ 4 (citing Tr. at 1078).) In its responsive 56.1 Statement, however, Defendant cites to page 1028 of the transcript for a similar proposition. (*See* D's 56.1 Resp. ¶ 7.) Accordingly, the Court assumes Defendant made a typographical error in its 56.1 Statement, and meant to cite to page 1028, not 1078.

> Teacher ("CT")] Services Direct and Indirect:  1x Daily for 1 hour 20 minutes in
> Regular Class and 1x Daily for 40 minutes in Alternative Days in Regular Class.
> For math . . . the IEP placed her in a general education class with CT Services
> Direct:  1x Daily, 40 minutes in Math Class.  Finally, the IEP offered a Special
> Class (ISP Study Skills) 12:1+3:1:  1x Daily for 40 minutes, Speech Language
> Therapy, 1x weekly for 30 minutes and minimal Family Training, 1x monthly for
> 1 hour in school.

(*Id.* ¶ 12; *see* Ps' Ex. E at 11.)  Plaintiff testified that she did not think this IEP provided S.S.

with the support she needed.  (Tr. at 1987:8-17.)  In some of S.S.'s classes, S.S. made "less than

anticipated progress," (Ps' Ex. M at 2, 8), but in other classes she met or was expected to meet

her goals, (*id.* at 4, 6 8-11, 13-14.)  S.S. passed her Living Environment Regents exam with a 68

that year, but failed the Regents exams in Global History and Algebra I by substantial amounts.

(Ps' Ex. K at 1.)  Plaintiffs also believed the IEP's provision of parent counseling and training

was insufficient.  (D's 56.1 Resp. ¶ 22; Tr. at 2001:21-2002:8.)

At some point, Plaintiffs made S.S.'s teachers aware "that the [Plaintiffs] had a long list

of dissatisfactions with S.S.'s program of ISP special education."  (D's 56.1 ¶ 5 (citing Tr. at

1390-93).)  The parties dispute when this was.  Defendant asserts that Plaintiffs did not notify the

District of their dissatisfaction until January 2016, during S.S.'s tenth-grade year.  (*See id.*)  At

the hearing before the IHO, however, one of S.S.'s teachers testified that Plaintiffs had raised

many concerns prior to January 2016, (*see* Tr. at 1390:20-1391:23), but January 2016 was the

first time Plaintiffs had said to the teachers that the District's program was not appropriate for

S.S., (*id.* 1394:25-1395:11).

### 2.   Gottesfeld Report

During S.S.'s tenth-grade year, Plaintiffs asked Dr. David Gottesfeld to conduct a

psycho-educational evaluation of S.S.  (Ps' 56.1 ¶ 35; P's Ex. I.)  Gottesfeld concluded that S.S.

suffered from Autism Spectrum Disorder, Attention Deficit Hyperactivity Disorder, Generalized

Anxiety Disorder, Specific Reading Disorder, Disorder of Expressive Writing, and Mathematics

4

Disorder.  (Ps. Ex. I at 21.)  He concluded that S.S.'s "current academic program is not appropriate," further stating:

> [S.S.] requires a residential school offering a small, structured 24/7 academic environment, interwoven therapeutic support and proven intensive remedial language based curriculum that not only presents topical material, but more importantly focuses intently on skill development and actively cultivating the independence and vocational aptitude that will be needed beyond high school.  She needs 24/7 exposure to peers and an environment taught by special education teachers who are experienced and trained to teach teenagers with her profile.  [She] needs to be in a community of peers on a similar developmental level to her own and in an academic setting where there is appropriate academic and vocational instruction for her cognitive needs and autism.  Without these appropriate supports, [S.S.] is at risk of academic, social, and behavioral regression.

(*Id.*)  Gottesfeld recommended that Plaintiffs provide his report to the District and that any IEP should include his diagnosis that S.S. had Autism.  (*Id.* at 22.)  He added that he was available to meet with District officials to help develop an appropriate IEP for S.S.  (*Id.*)

On May 9, 2016, Plaintiffs' counsel provided Gottesfeld's report to the District and the CSE to consider in developing S.S.'s IEP for the following year.  (*Id.* at 1.)  At least two District employees, including the CSE chairperson Carolyn McGuffog and school psychologist Gregory Kemp, believed that Gottesfeld's report was unreliable.  (D's 56.1 Resp. ¶¶ 70-72.)

### 3.    2016 CSE Meetings and 2016-17 IEP and School Year

On May 17, 2016, the CSE convened to review S.S.'s "functional behavior assessment" ("FBA"), conduct a "program review," conduct an annual review, and create an IEP for S.S.'s eleventh grade school year.  (Ps' 56.1 Resp. ¶ 8; D's Ex. 3 at 1; D's Ex. 5 at 1.)  At the meeting, the CSE discussed the results of the FBA and "reviewed the entirety of S.S.'s special education program that S.S. had been attending and then discussed S.S.'s progress toward achievement of her IEP goals."  (Ps' 56.1 Resp. ¶ 9.)  Also at the meeting, the CSE stated its disagreement with Gottesfeld's "psychological assessments of S.S.'s social/emotional domain and the recommendation for a residential placement."  (*Id.* ¶ 11.)  That said, the CSE asked Gottesfeld –

who gave testimony at the meeting – to explain why he thought a more restrictive setting was needed for S.S. (D's Ex. 5 at 3.)

The CSE also heard from the Parents. (*See id.* at 2-3.) D.S. stated that S.S. did not display at home the social skills discussed in school, and McGuffog responded that S.S. requires generalization training, and that could be provided through "home service." (*Id.* at 2.)[4] Further, McGuffog "discussed whether there should be more parent training on the IEP and the discussion included that the teachers and school could improve generalizability with more input for . . . organization at home." (*Id.* at 3.) The Parents also expressed concerns about Regents classes, but McGuffog explained that S.S. would receive extra support from a CT and teaching assistant to help her in those classes. (*Id.* at 2.) The Parents next asked why S.S. had no friends and had issues socializing at school, and McGuffog explained that there were social opportunities in the ISP, as many other students in it had profiles similar to S.S.'s. (*See id.* at 3.)

The Parents requested that the CSE consider a residential placement, (Tr. at 2063:5-12), but the District did not think such a placement was appropriate for S.S., as she was "too high functioning," so they did not search for or explore any residential placements, (*id.* at 686:23-687:8; *see id.* at 2065:2-7 (D.S.'s testimony that CSE "refused to consider . . . out-of-district residential placement. They did not feel as though [S.S.] had the profile as a student who needed a residential placement."). McGuffog testified that the CSE discussed the District's more restrictive program (which is more self-contained than the ISP, but not totally self-contained), but the CSE determined that S.S. was too high-functioning for that program as well. (*Id.*

---

[4] The parties do not explain what "generalization" is, but the Court understands it to refer to the ability of the student to apply at home and in the community the problem-solving and time-management skills taught in school.

at 686:13-687:8.)  When D.S. stated that she thought S.S. needed a "24-hour scenario," or 24-

hour support, McGuffog stated, "I think we will agree to disagree."  (Ps' 56.1 ¶ 74.)[5]

Following the meeting, the CSE recommended that S.S. remain in the ISP,

which consisted of a 15:1 special class for English (modified English) one time
daily for 40 minutes; a 15:1 special class for social studies one time daily for 40
minutes (modified social studies); a 12:1+(3:1) special class for ISP study skills
one time daily for 40 minutes; a 12:1+(3:1) special class for ISP study skills one
time daily on alternate days for 40 minutes; consultant teacher services (direct ISP)
for math one time daily for 40 minutes; consultant teacher services (direct and
indirect ISP) in science class one time daily for 40 minutes; consultant teacher
services (direct and indirect ISP) for vocational skills two times daily for 40
minutes; and consultant teacher services (direct and indirect ISP) for physical
education one time on alternate days for 40 minutes (direct and indirect ISP).

(D's 56.1 ¶ 13; D's Ex. 5 at 1, 10.)[6]  The CSE also recommended that S.S. have "one 30-minute

session per week of small group speech-language therapy, one 30-minute session per week of

small group social skills training, and one 60-minute session per week of individual family

training in home and/or school," (P's 56.1 Resp. ¶ 14; D's Ex. 5 at 1), and that S.S. would be part

of a "12-month" program and thus take a special 12:1+2 class in July and August daily for six

hours, (D's 56.1 ¶ 15; D's Ex. 5 at 1.)[7]  The IEP also noted that S.S.'s "classification" should be

changed to reflect "Autism," as recommended by Gottesfeld.  (D's Ex. 5 at 3.)

[5] Defendants dispute this statement, arguing that the transcript of the CSE meeting is not
reliable, as found by the State Review Officer ("SRO").  (D's 56.1 Resp. ¶ 74 (citing SRO
Decision at 18 n.3).)  The SRO did find the transcript inaccurate, and instead relied on the
recording itself, but on the very next page of that same SRO decision, the SRO explained how
the transcript and recording of the May 2016 CSE meeting both established that McGuffog
responded to D.S.'s statement that S.S. needed a "24-hour scenario" by stating, "I think we can
agree to disagree."  (SRO Decision at 19.)  Accordingly, Defendants' dispute is rejected.

[6] Plaintiff disputes the aforementioned, stating that the "services were not appropriate or
clear at the meeting," (P's 56.1 Resp. ¶ 13), but whether the Plaintiffs understood the proposed
IEP at the time of the meeting or think the IEP was appropriate does not create a dispute
regarding what the CSE recommended.

[7] Plaintiffs say the summer class was only briefly mentioned at the meeting, but they do
not dispute that it was part of the program contained in the IEP.  (See Ps' 56.1 Resp. ¶ 15.)

On August 18, 2016, Plaintiffs sent the District a letter notifying it of their intention to unilaterally place S.S. at the Riverview School ("Riverview") in Massachusetts for the 2016-17 school year.  (D's 56.1 ¶ 17; Ps Ex. N at 2.)[8]

The CSE then reconvened on August 31, 2016, to discuss the concerns the Parents expressed in their letter.  (D's Ex. 4 at 1.)  At this meeting, D.S. explained that she believed the ISP was inappropriate and inadequate for S.S. and that S.S. was not progressing.  (Id. at 2.) Specifically, D.S. reiterated her concerns that S.S. would face issues with socialization, but the District's special education teacher noted that S.S. would be in a peer-mentorship program that would offer her the opportunity to make friendships.  (Id.)  The teachers noted that they had observed increases in S.S.'s self-confidence and self-advocacy and that she actively participated in class and worked in groups with more typical students.  (Id.)  When D.S. reiterated her concerns about S.S.'s progress at home not matching her progress at school, the special education teacher noted that S.S. was eligible for "[Office for People with Developmental Disabilities ("OPWDD")] services in the home and community."  (Id.)  D.S. also stated that she believed the ISP was "too piecemeal for S.S."  (D's 56.1 Resp. ¶ 80.)

After hearing from the Parents, McGuffog stated her belief that a residential program "would be too restrictive," (D's Ex. 4 at 2-3), and noted that "S.S. was on the Career Development and Occupational Studies Commencement Credential (CDOS) track, and a

_____

[8] Plaintiffs dispute this assertion, stating that they "notified the [CSE] of their intent to place S.S. unilaterally at [the May 2016] meeting."  (Ps' 56.1 Resp. ¶ 17.)  But to support that dispute, Plaintiffs cite to a portion of the transcript before the IHO where an ISP Program Coordinator acknowledged that Plaintiffs asked the CSE to look into residential placements at the May 2016 meeting.  (Tr. at 1495:5-9.)  But asking the CSE to look into residential placements is a far cry from stating their unilateral intention to place S.S. at any residential program, let alone at Riverview, during that meeting.  Accordingly, this fact is accepted as undisputed for purposes of this motion.

candidate for the lab school at the community college and that it would be beneficial for S.S. to remain in the District and build relationships in the community," (Ps' 56.1 Resp. ¶ 22).

After the August 2016 meeting, "the [CSE] agreed to add goals addressing functional math, self-advocacy in the community, self-regulation, and flexibility with regard to changes in routines." (D's Ex. 4 at 2.)  The CSE also reviewed S.S.'s speech goals and agreed on a new conversational goal involving abstract and figurative language. (*Id.*)  But ultimately, the CSE recommended that S.S. should "continue to participate in the [ISP] at Pleasantville High School" despite the Parents' disagreement with the recommendation. (*Id.* at 3.)

Following the August 2016 meeting, Plaintiffs insisted that S.S. required a residential placement. (Ps' 56.1 Resp. ¶ 23.)  Plaintiffs unilaterally placed S.S. at Riverview for the 2016-17 school year. (*Id.*)  At the end of the 2016-17 school year, Riverview noted that "S.S. had made significant gains toward all of her goals." (Ps' 56.1 ¶ 104; *see id.* ¶¶ 105-110.)

### 4.    2017 CSE Meetings and 2017-18 IEP and School Years

In May 2017, the CSE convened to conduct S.S.'s annual review, conduct her triennial reevaluation, and develop an IEP for her twelfth-grade year. (Ps' 56.1 Resp. ¶ 24.)  The Parents stated that they would not sign the IEP unless they saw it prior to the meeting, but McGuffog stated that IEP was not yet prepared as it was to be developed at the meeting. (D's Ex. 6 at 2.)

"[T]he CSE considered re-evaluation . . . reports, including standardized social-emotional assessments, as well as oral reports from the staff at Riverview School who had worked with S.S. and administered her private school program." (Ps' 56.1 Resp. ¶ 25.)  After the aforementioned review, the CSE found S.S.'s abilities to be in line with where they were the previous year. (D's Ex. 6 at 2-3.)

The CSE also heard from the Parents, who asked who would wake the student up if she was no longer at a residential facility, to which a special education teacher responded that the District would provide home training for the Parents to address this issue. (*Id.* at 2.) The Parents stated their concern about S.S.'s ability to make friends, but the special education teacher noted that S.S. had made friends while in the ISP. (*Id.* at 3.) The Parents maintained their position that S.S. belonged in a residential placement, and the District maintained its position that a residential placement would be too restrictive. (Ps' 56.1 Resp. ¶¶ 26, 34.) The "county representative" asked if there was middle ground between Riverview and the District's ISP and asked about whether S.S. could access the "District's OPWWDD." (D's Ex. 6 at 3.) The CSE responded that "a day program (*i.e.*, special class in a segregated setting) would be a middle ground." (*Id.*) Ultimately, the CSE recommended that S.S. continue in the District's ISP. (*Id.* at 2-3.)

The 2017-18 IEP included fewer classes with the designation "special class" than the 2016-17 IEP. (*Compare* D's Ex. 5 at 10 ("special classes" in English and social studies), *with* D's Ex. 6 at 18 (no "special class" in English or social studies).) The 2017-18 IEP did, however, add individual counseling for thirty minutes per week, which was not included in the previous year's IEP. (D's Ex. 6 at 4.)

On August 9, 2017, Plaintiffs provided notice in writing to the District that they were rejecting the District's IEP and maintaining their unilateral placement of S.S. at Riverview. (D's 56.1 Resp. ¶ 93; P's Ex. V.)

On August 29, 2017, the CSE convened again. (D's Ex. 7 at 1.) D.S. spoke about Riverview's benefits and the shortcomings of the District's ISP. (*Id.* at 1-2.) Plaintiffs again requested that S.S. be placed in a residential program, and the CSE again stated that it found a residential program to be too restrictive. (*Id.* at 2-3.) In response to some the Parents' concerns,

however, the CSE "added a goal to address [S.S.] coping with stress" and "add[ed] speech and language consult so the [District's speech] therapist may work with the student directly in the community to address that need." (*Id.* at 2.)  The Parents still rejected the District's 2017-18 IEP for S.S., (Ps' 56.1 Resp. ¶ 38), and the Parents kept S.S. at Riverview for the 2017-18 school year, (*id.* ¶ 41).[9]  S.S. made considerable progress that year at Riverview.  (Ps' 56.1 ¶¶ 111-122.)

## B.   Procedural History

### 1.   Due Process Complaint and Impartial Hearing Officer Decision

On September 1, 2017, the Parents filed a Due Process Complaint ("DPC") claiming that (1) the District failed to offer or provide S.S. with a free appropriate public education ("FAPE") for the 2016-17 and 2017-18 school years, (2) Riverview was an appropriate program, and (3) equitable considerations supported their claim for tuition reimbursement.  (D's Ex. 1 ¶¶ 56-78.)  In the DPC, the Parents alleged, among other things, that the "CSE for both the 2016-2017 and 2017-2018 school years deprived the Parents of input by failing to consider whether S.S.

---

[9] In Plaintiffs' 56.1 Statement, they asserted, "The Parents again disagreed with the meeting and stated that they were maintaining S.S. at Riverview." (P's 56.1 ¶ 99 (citing Tr. at 2223).)  Defendant responded to Plaintiffs' assertion by stating "This statement is not supported by the record reference cited as required by Local Rule 56.1(d) and, consequently, does not require a response." (D's 56.1 Resp. ¶ 99.)  It may be true that the record reference only supports that the parents disagreed at the meeting and that they sent S.S. to Riverview for the 2017-18 year, and not that they stated at the meeting that would send S.S. to Riverview for that year, but Defendant's response is nevertheless puzzling, as Defendant in its own 56.1 Statement asserted, "The Parents remained dissatisfied with the District's CSE recommendations, and S.S. attended the Riverview School for the 2017-2018 school year." (D's 56.1 ¶ 41.)  Defendant's hyper-technical response to Plaintiffs' Statement misses the point of 56.1 Statements and responses.  The purpose of these Statements is to clarify which facts are undisputed.  That the Parents disagreed with the 2017-18 IEP and placed S.S. at Riverview is undisputed, clearly, as both parties included that fact in their 56.1 Statements.  That makes it all the more odd that Defendant refused to acknowledge as much in its responsive 56.1 Statement.  Defendant stated that its issue was that the cited evidence did not fully support Plaintiff's assertion, but in that event, the party should specify what portions of the statement it is challenging and what portions it is not challenging.

needed a residential placement."  (*Id.* ¶ 59; *see id.* ¶ 22 ("CSE declined to appropriately consider the input of Dr. Gottesfeld or the Parents and even consider the need for a residential placement search."); *id.* ¶ 30 ("The CSE failed in seriously considering parental input".).)

The IHO held a hearing on the Parents' DPC spanning multiple dates between November 2017 and June 2018, and issued a decision on December 10, 2018.  (IHO Decision at 1, 17.)  The IHO first addressed the Parents' claim that the District predetermined that it would recommend only its own ISP and did not consider any other programs, thereby thwarting the Parents' participation in the IEP process.  (*Id.* at 12-14.)  The IHO – analyzing the issue in one-and-a-half double-spaced pages – found that the District "was of a 'predetermined' mind" and "effectively 'minimized'" the Parents by failing to recognize their position, (*id.* at 12-13 (first quoting *P.F. v. Bd. of Educ. of the Bedford Cent. Sch. Dist*., No. 15-CV-507, 2016 WL 1181712, at *7 (S.D.N.Y. Mar. 25, 2016), then quoting Tr. at 1309)), and that the District carried "[t]his mindset . . . into the 2017/2018 school year as well," (*id.* at 13).  The IHO explained that the CSE stifled and substantially impaired the Parents' role in developing and implementing S.S.'s IEP by failing to account for the Parents' position, (*id.* at 13-14), but stated that the predetermination was not done to intentionally preclude the Parents' participation; rather, it was the result of overconfidence and "pride demonstrated by the District Witnesses in the District's program, and the effort to educate the Parents about the potential of the ISP placement," (*id.* at 13).

The IHO next found that Plaintiffs met their burden of establishing the appropriateness of S.S.'s placement at Riverview.  (*Id.* at 14-16.)  Finally, the IHO determined that equitable considerations supported the Parents' claims.  (*Id.* at 16-17.)  Accordingly, the IHO ordered the District to provide the Parents with full reimbursement for payments made to Riverview for the 2016-17 and 2017-18 school years.  (*Id.* at 17.)

The IHO did not address whether the District substantively provided a FAPE to S.S. for the 2016-17 and 2017-18 school years.

### 2.      District's Appeal and SRO Decision

The District "appeal[ed] from the IHO's determinations that the [D]istrict did not provide the student with a FAPE for the 2016-17 and 2017-18 school years, that the [P]arents' unilateral placement of the student at Riverview was appropriate, and that equitable considerations supported an award of tuition reimbursement." (SRO Decision at 8.)  The Parents answered the District's appeal, arguing that the appeal should be dismissed and the IHO's decision should be affirmed in its entirety. (*Id.* at 9.)  They stated that the IHO correctly found that the District "denied the [P]arents' right to meaningfully participate in the development of the May 2016 and May 2017 IEPs and that . . . the [D]istrict had predetermined its recommendations for both school years." (*Id.*)  They also argued that the IHO properly found their unilateral placement of S.S. at Riverview to be appropriate, and equitable considerations warranted a full tuition reimbursement. (*See id.*)10  The Parents did not cross-appeal.

On March 13, 2019, the SRO issued a decision sustaining the District's appeal. (*Id.* at 29.)  First, the SRO framed the scope of her review.  She explained that because the Parents did "not cross-appeal[] from the IHO's failure to address" their claims that the District did not provide S.S. with a FAPE for the 2016-17 and 2017-18 school years, "and have not otherwise asserted [those arguments] on appeal as additional bases for upholding the IHO's determination

---

10 The Parents also argued that the District failed to timely serve their appeal and failed to file an accurate certified record on appeal. (*See* SRO Decision at 12-13.)  Both of those arguments were rejected by the SRO, and in any event, they are not relevant here, so the Court does not address them further.

that the district failed to offer the student a FAPE," those issues were beyond the scope of her

review.  (*Id.* at 13-14.)  In other words, because

> the only issues raised in the [P]arents' answer relate to whether the IHO properly
> determined that the parents' right to meaningfully participate in the development
> of the student's 2016-17 and 2017-18 IEPs was denied because the May 2016 and
> May 2017 CSEs had predetermined their recommendations, and if so, whether the
> parents' unilateral placement was appropriate and equitable considerations favored
> reimbursement:  those are the only issues that will be addressed on appeal.

(*Id.* at 14.)

The SRO found that "[o]nce the CSE determined that the ISP was an appropriate

placement in the least restrictive environment in which the student could have been educated, the

CSE was not required to thereafter consider other more restrictive placements."  (*Id.* at 15.)  In

other words, the District was not required to consider placing a student in a private school (or

even a more restrictive public program) if it identified a less restrictive public placement in

which the student can be satisfactorily educated.  (*Id.*)  Accordingly, "[t]he only issue on appeal

[was] whether the [D]istrict appropriately considered the parents' request for residential

placement or whether it predetermined the student's placement."  (*Id.*)  The SRO devoted eleven-

and-a-half single-spaced pages to analyzing that issue.  (*Id.* at 17-28.)

The SRO found that the audio recording of the May 17, 2016 CSE meeting "clearly

demonstrates that the [P]arents, particularly the student's mother, engaged in a robust discussion

with other CSE members."  (*Id.* at 18.)  Further, the Parents' "private psychologist participated,"

including reading aloud from his report for over thirty minutes and answering questions from

McGuffog and some of S.S.'s teachers.  (*Id.* at 18.)  Specifically, McGuffog discussed with

Gottesfeld the restrictiveness of a residential placement and explained that many students with a

profile similar to S.S.'s are in the District's ISP.  (*Id.*)  The CSE also asked Gottesfeld questions

about how a residential program could meet S.S.'s needs, to which Gottesfeld opined that S.S.

could possibly "live independently" if taught in a residential program, but her "ability to generalize and problem solve would probably always be limited." (*Id.* at 19.)[11]  The SRO found that the aforementioned established that the CSE took the Parents' concerns into account during the May 2016 meeting.  The SRO then noted that after the Parents wrote the August 18, 2016 letter explaining their intention to unilaterally place S.S. at Riverview, the CSE convened again and listened to the Parents' concerns and changed some aspects of the IEP.  (*See id.* at 21-22.) The SRO concluded, "Given [the District's] willingness to reconvene and address the [P]arents' concerns and to make changes to the IEP, the hearing record does not support the IHO's determination" that the CSE did not have an open mind, and the appeal regarding predetermination for the 2016-17 IEP was sustained.  (*Id*. at 23.)

The SRO then reviewed the District's appeal regarding the 2017 CSE meetings and 2017-17 IEP.  First, the SRO found that "the IHO's decision concerning that school year is conclusory and lacks any evidentiary support in the hearing record." (*Id.*)  Even though that alone was ground to reverse the IHO, the SRO went on to review the May and August 2017 CSE meetings "to determine whether the [D]istrict predetermined its program at those meetings and if the parents had an opportunity to participate in the development of the student's program." (*Id.*)[12] The SRO noted that "several representatives from Riverview" participated in the May 2017 CSE meeting and provided updates on S.S.'s progress, which the CSE said would be "noted in the

---

[11] Surprisingly, Defendant did not cite to the underlying record in its 56.1 Statement with regard to the CSE's engagement with Gottesfeld at the May 2017 meeting, but rather cited to the SRO's description of the underlying record.  (D's 56.1 ¶ 50.)

[12] The SRO stated she was considering the "May 2017 CSE and August *2018* CSE," (SRO Decision at 23 (emphasis added)), but the Court finds that this was a typographical error, as the SRO goes into detail about the August 2017 meeting, (*id.* at 26-28), and there is nothing in the record regarding an August 2018 CSE meeting.

[IEP's] PLEPs." (*Id.* at 24.)13  The SRO added that members of the CSE and the District tried to alleviate some of the Parents' concerns about support at home, socialization, Regents exams, and transition out of high school.  (*See id.* at 24-25.)  And when "the 'county representative' asked about a 'middle ground between [the District] High School and the student's boarding school . . . the [District's] director [of educational services] explained that a day program (*e.g.*, special class in a segregated setting) would be the middle ground." (*Id.* at 25.)  After the Parents wrote a letter rejecting the District's IEP, the CSE convened again, at which time the director addressed many of the concerns the Parents raised in their letter.  (*Id.* at 26.)  For example, the CSE noted that S.S. was to be provided with individual and group counseling, internship opportunities in the community, and test-anxiety workshops, among other things.  (*See id.* at 26-27.)  The CSE also added a speech-language consult to address some of the Parents' concerns.  (*Id.* at 27.)  The SRO further stated that "the director noted that once the parent stated her concerns, the district had been trying to address them; but the parent stated that the student's needs could not be met in a non-residential placement." (*Id.* at 28.)

The SRO concluded:

[T]he hearing record reflects that the CSE listened to a number of the [P]arents' concerns and attempted to adapt its program or provide additional services to address those concerns; however, the [D]istrict did not accede to the [P]arents' request for placement in a residential school.  Considered as a whole, the hearing record reflects a parental disagreement with [the District's] proposed IEP and placement recommendation that does not amount to predetermination by the [D]istrict or a denial of the [P]arents' meaningful participation in the development of the program.

13 The Court understands PLEP to stand for "Present Level of Educational Performance."

(*Id.*)  Accordingly, the SRO reversed the IHO's decision that the District failed to offer S.S. a FAPE for the 2016-17 and 2017-18 school years and directing the District to reimburse the Parents for tuition.  (*Id.* at 29.)

### C.      The Instant Action

On July 19, 2019, Plaintiffs filed their operative Complaint against Defendant, alleging that:  (1) the SRO erroneously held that Plaintiffs waived their substantive FAPE claims by failing to cross-appeal the IHO decision to not address those claims, (2) the SRO erroneously held that the District properly considered the continuum of services for S.S., (3-4) the SRO erroneously found that the District did not predetermine S.S.'s placement for the 2016-17 and 2017-18 school years, and (5) the District failed to offer S.S. a substantive FAPE for the 2016-17 and 2017-18 school years.  (Doc. 6 ("Compl.") ¶¶ 182-241.)

On August 8, 2019, Defendant filed a pre-motion letter.  (Doc. 11.)  That same day, the Court ordered Defendant to file another pre-motion letter, this time laying out its grounds for the motion, and ordered Plaintiffs to respond to Defendant's forthcoming letter.  (Doc. 12.) Plaintiffs filed a pre-motion letter before Defendant could comply with the Court's Order, (Doc. 13), and then Defendant filed its second pre-motion letter, (Doc. 16), and Plaintiffs responded, (Doc. 17).  The Court held a pre-motion conference on September 27, 2019, at which Defendant's counsel stated that the parties had reached an agreement whereby Plaintiffs waived Defendant's obligation to answer and only Defendant, not Plaintiffs, would file a motion for summary judgment.  (Minute Entry dated Sept. 27, 2019.)  The Court set a briefing schedule, and the parties stated their intention to bundle their motion papers, (*id.*), but it appears there was some confusion regarding bundling.

After both parties requested and received extensions, Defendant served its motion papers on Plaintiffs, but did not file on the docket at that time, as contemplated by the parties' agreement at the September 2019 conference to bundle.  Plaintiffs, however, filed their opposition to Defendant's motion, as well their own motion for summary judgment, and supporting papers on February 25, 2020.  (Docs. 23-26.)  On April 6, 2020, Defendant filed all of its motion papers, including its opening and reply briefs.  (Docs. 31-36, 39.)  On April 14, 2020, Plaintiffs filed a letter-motion for leave to file a sur-reply.  (Doc. 40.)  Defendant opposed Plaintiff's motion, (Doc. 41), and Plaintiffs filed a second letter in response to Defendant's opposition, (Doc. 42).  The Court denied Plaintiffs request to file a sur-reply, in light of the substantive nature of the letters.  (Doc. 43.)

## II.    LEGAL STANDARD

Motions for summary judgment customarily resolve Individuals with Disabilities in Education Act ("IDEA") actions, *see* 20 U.S.C. § 1401, *et seq.*, in federal court.  *See Antonaccio ex rel. Alex v. Bd. of Educ.*, 281 F. Supp. 2d 710, 714 (S.D.N.Y. 2003).  Under the IDEA, unlike in the usual case, the existence of a disputed issue of fact will not defeat the motion.  *Id.*  Rather, summary judgment "is a pragmatic procedural mechanism for reviewing administrative decisions."  *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (internal quotation marks omitted).  In reviewing an action pursuant to 20 U.S.C. § 1415(i), the district court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C)(iii); *see P.C. v. Rye City Sch. Dist.*, 232 F. Supp. 3d 394, 406 (S.D.N.Y. 2017).

The court's review "requires a more critical appraisal of the agency determination than clear-error review but falls well short of complete *de novo* review." *L.O. ex rel. K.T. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 108 (2d Cir. 2016) (internal quotation marks omitted). The district court must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence, but its review of state administrative decisions is limited. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 205-06 (1982); *M.H. ex rel. P.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 240 (2d Cir. 2012); *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998). "While federal courts do not simply rubber stamp administrative decisions, they are expected to give due weight to these proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Walczak*, 142 F.3d at 129 (alteration and internal quotation marks omitted); *see M.H.*, 685 F.3d at 240.

In many instances, "the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court," but the determination "must also be colored by an acute awareness of institutional competence and role." *M.H.*, 685 F.3d at 244. Deference to administrative decisions is particularly warranted where the district court's review "is based entirely on the same evidence as that before the SRO," *id.*, and where the IHO and SRO decisions are in agreement. *C.W. ex rel. W.W. v. City Sch. Dist. of N.Y.*, 171 F. Supp. 3d 126, 131-32 (S.D.N.Y. 2016). Where the IHO and SRO decisions conflict, the IHO's "may be afforded diminished weight," as the Court "defer[s] to the final decision of the state authorities" – that is, the SRO's decision. *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171

(2d Cir. 2009) (internal quotation marks omitted).  Reviewing courts should also be mindful that they are not to "substitute their own notions of sound educational policy for those of the school authorities which they review." *Rowley*, 458 U.S. at 206.  Accordingly, "a court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned," *R.E. ex rel. J.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012), particularly with respect to "determinations regarding the substantive adequacy of an IEP," *M.H.*, 685 F.3d at 244.  In short, deference to "the application of expertise and the exercise of judgment by school authorities" is appropriate where they "offer a cogent and responsive explanation for their decisions." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 1001-02 (2017).

## III.  DISCUSSION

### A.  Predetermination

"The IDEA requires States receiving federal funds to provide 'all children with disabilities' with a FAPE," which includes "'special education and related services' tailored to meet the unique needs of a particular child." *Mr. P v. W. Hartford Bd. of Educ.*, 885 F.3d 735, 741 (2d Cir.) (first quoting 20 U.S.C. § 1412(a)(1)(A); then quoting *id.* § 1401(9)), *cert. denied*, 139 S. Ct. 322 (2018).  The IEP must be developed annually by "[a] school official qualified in special education, the child's teacher, the child's parents, and, where appropriate, the child." *Walczak*, 142 F.3d at 122.  "A school district meets its obligations to provide a FAPE by creating an IEP that is developed in compliance with the IDEA's procedural and substantive requirements." *N.B. v. N.Y.C. Dep't of Educ.*, 711 F. App'x 29, 32 (2d Cir. 2017) (summary order).

"In addition to providing an education that is likely to produce progress and tailored to the unique needs of the child, the program must be offered in the least restrictive environment." *Avaras ex rel. A.A. v. Clarkstown Cent. Sch. Dist.*, No. 18-CV-6964, 2019 WL 4600870, at *2 (S.D.N.Y. Sept. 21, 2019) (citing 20 U.S.C. § 1412(a)(5)(A)). "[A] disabled student's least restrictive environment refers to the least restrictive educational setting consistent with that student's needs, not the least restrictive setting that the school district chooses to make available." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 163 (2d Cir. 2014). "This requirement expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers." *Id.* at 161 (internal quotation marks omitted).

The IDEA requires, among other things,

An opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child.

20 U.S.C. § 1415(b)(1); *see Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005). "The regulations governing parental participation provide that '[e]ach public agency shall take steps to ensure that one or both of the parents of a child with a disability are present at each IEP meeting or are afforded the opportunity to participate.'" *Cerra*, 427 F.3d at 192-93 (quoting 34 C.F.R. § 300.345(a)) (alteration in original). "[T]he importance Congress attached to [this and other] procedural safeguards cannot be gainsaid." *Rowley*, 458 U.S. at 205. Accordingly, "[p]redetermination of a child's IEP amounts to a procedural violation of the [IDEA] if it deprives the student's parents of meaningful participation in the IEP process." *B.K. v. N.Y.C. Dep't of Educ.*, 12 F. Supp. 3d 343, 358 (E.D.N.Y. 2014) (collecting cases); *see J.G. ex rel. N.G. v. Kiryas Joel Union Free Sch. Dist.*, 777 F. Supp. 2d 606, 648 (S.D.N.Y. 2011)

("Predetermination by a CSE of a child's IEP amounts to a procedural violation of the IDEA.") (internal quotation marks omitted).  Courts, however, "regularly reject claims of predetermination where the record reflects active and meaningful participation by the student's parents in the formulation of the IEP."  *B.K.*, 12 F. Supp. 3d at 358 (collecting cases).

As a threshold matter, the issue of predetermination is not a matter requiring educational expertise.  In other words, one need not have a background in education or educational policy to consider and determine whether the CSE had an open mind going into the 2016 and 2017 meetings.  Thus, a lesser degree of deference is owed to the SRO on this issue than is due on a more squarely educational issue, like whether a FAPE is substantively appropriate.  *See R.E.*, 694 F.3d at 189; *see also P.F. v. Bd. of Educ. of the Bedford Cent. Sch. Dist.*, No. 15-CV-507, 2016 WL 1181712, at *6 (S.D.N.Y. Mar. 25, 2016) ("Less deference is warranted in appeals involving an IEP's procedural validity . . . .").  But "deference owed to an SRO's decision depends on the quality of that opinion" and "[d]eference is particularly appropriate when the state officer's review has been thorough and careful," *R.E.*, 694 F.3d at 184, 189 (internal quotation marks omitted), and there can be no doubt that the SRO's decision here was thorough and careful – by any standard, not just compared to the IHO's cursory and conclusory treatment of the issue – meaning that deference is due.

Turning to the parties' arguments, Defendant states that

[t]he circumstances detailed by the SRO under which the Parents and CSE members expressed their positions and disagreements and the CSE's responses to the Parent's concerns and insistence that their daughter must be sent to a residential facility in Massachusetts . . .  support the SRO's conclusion that there was no improper predetermination that the ISP program would be more appropriate for S.S. than a residential placement in a private boarding school.

(Doc. 32 ("D's Mem.") at 7.)  Specifically, Defendant first argues that once the CSE determined the ISP was an appropriate program for S.S. for her 2016-17 and 2017-18 school years, it had no

obligation to consider more restrictive programs. (*Id.* at 7-8.) Defendant next argues that the CSE's efforts to respond to the Parents' concerns, including making modifications to the IEPs, while contending that a residential placement would be overly restrictive, shows that the Parents had meaningful participation in creating the IEPs. (*Id.* at 8.) It contends that the fact that the CSE disagreed with the Parents and Gottesfeld does not mean that it engaged in predetermination. (*Id.* at 9-10.) The Court agrees

First, as noted by Defendant, "[c]ourts in this Circuit have uniformly held that the CSE is not required to consider non-public placements after it determines that a public placement is available that has the ability to implement the CSE." *M.B. v. N.Y.C. Dep't of Educ.*, No. 14-CV-3455, 2017 WL 384352, at *7 (S.D.N.Y. Jan. 25, 2017). Thus, once the CSE determined that the District's ISP was an appropriate placement and was the least restrictive environment under which S.S. could be educated, it was not required to consider any more restrictive placement, let alone a private residential program out of state.[14] That does not mean the District was free to disregard the Parents' input, but the District was free to not seriously consider Riverview.

Further, the Court agrees with the SRO's thorough analysis of the CSE meetings in 2016 and 2017, finding that the CSE provided the Parents with a meaningful opportunity to participate. "Courts have rejected predetermination claims where the parents actively and meaningfully participated in the development of the IEP" and "where there was credible evidence that the school district was open-minded at the IEP meeting." *J.G.*, 777 F. Supp. 2d at 648 (collecting cases). Here, the District reviewed and considered Gottesfeld's report, and heard from Gottesfeld at the May 2016 CSE meeting and asked him questions about his report and

---

[14] For that reason, Plaintiffs' claim that the District failed to properly consider the continuum of services for S.S. fails, as the District properly considered all that it had to.

about his recommendations for S.S.  (SRO Decision at 18.)  As a result of Gottesfeld's report, the IEP added "Autism" to S.S.'s classification, (D's Ex. 5 at 3), showing that the CSE did not dismiss it out of hand.  Additionally, the CSE heard from at least D.S. (and at times both Plaintiffs) at each of the four meetings.  (D's Exs. 3-7.)  And at the 2017 meetings, the CSE invited and heard from Riverview staff who spoke about S.S.'s performance at that school.  (Ps' 56.1 Resp. ¶ 25.)  After hearing from the aforementioned individuals, the CSE made modifications to S.S.'s IEPs.  Specifically, after the August 2016 meeting, "the [CSE] agreed to add goals addressing functional math, self-advocacy in the community, self-regulation, and flexibility with regard to changes in routines" and agreed on a new conversational goal involving abstract and figurative language.  (D's Ex. 4 at 2.)  The next year, after Plaintiffs again requested that S.S. be placed in a residential program, the CSE "added a goal to address [S.S.] coping with stress" and "add[ed] speech and language consult so the [District's speech] therapist may work with the student directly in the community to address that need."  (D's Ex. 7 at 2.)

Taking these facts together, the Court finds that the SRO properly found by a preponderance of the evidence that the CSE allowed the Parents to meaningfully participate in the District's development of S.S.'s IEP.  *See J.P. ex rel. J.P v. City of N.Y. Dep't of Educ.*, 717 F. App'x 30, 32 (2d Cir. 2017) (summary order) (no predetermination where "CSE heard [parents'] objections, considered materials they submitted, and convened a second meeting to address their objections and explain its reasoning, and that [student's] parents fully participated in both CSE meetings"); *T.P. ex rel S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 253 (2d Cir. 2009) (parents "meaningfully participated" in CSE meeting where CSE adopted "the parents' recommendations that [district] staff observe [student] over the summer and meet with his home providers, and that [district] staff receive training on how to educate [student],"

but denied request to have an entirely different special education program); *M.B.*, 2017 WL 384352, at *7 (no predetermination where "CSE reviewed the evaluative input of the [private] School and . . . re-evaluation of [student] was undertaken because the parents had requested placement in the more restrictive setting of the [private] School"); *M.M. ex rel. A.M. v. N.Y.C. Dep't of Educ. Region 9 (Dist. 2)*, 583 F. Supp. 2d 498, 507 (S.D.N.Y. 2008) (no predetermination where, among other things, "the IEP incorporated evaluations of the Student conducted by professionals of the Plaintiffs' choosing and the goals those professionals recommended").

Plaintiffs' arguments to the contrary are unpersuasive.  Plaintiffs first argue that "[t]he CSE impeded parental opportunity on decision-making and engaged in predetermination by only considering one placement for S.S., about which the Parents had serious concerns, at each and every one of the four (4) CSE meetings during 2016-17 and 2017-18," as "the CSE only considered the ISP Program and was adamant that it was appropriate for S.S."  (Doc. 24 ("Ps' Mem.") at 5.)  But that Plaintiffs were unable to convince the District that its ISP was inappropriate does not mean that the District engaged in predetermination.  Rather, "[i]n light of the district's broad discretion to adopt programs that, in its educational judgment, are most pedagogically effective, [the court] cannot simply assume that the decision to rely heavily on a single method or style of instruction is necessarily inappropriate."  *M.H.*, 685 F.3d at 257. Further, the CSE addressed Plaintiffs' concerns at each meeting by explaining how the ISP would properly address S.S.'s needs.  (*See* D's Ex. 4 at 2-3; D's Ex. 5 at 1-2; D's Ex. 6 at 3-4; D's Ex. 7 at 1-2.)  Thus, there is evidence that the CSE reviewed and considered Plaintiffs' stated concerns, but thought that the ISP appropriately addressed them.

25

Plaintiffs next argue that the District's failure to meaningfully change the IEPs even after the Parents expressed their concerns and supported those concerns with Gottesfeld's report shows that the District did not have an open mind.  (Ps' Mem. at 6-7.)  To support their argument, Plaintiffs cite to *P.F.*, (P's Mem. at 6), a case in which a district was found to have predetermined a student's placement where, among other things, the district "did not make any changes to the proposed IEP," and after further meetings with the parents, "no significant change[s] were made to the IEP."  2016 WL 1181712, at *3.  But while the CSE here did not change S.S.'s IEPs in the way that Plaintiffs would have liked, it did implement changes to both IEPs after hearing Plaintiffs' objections.  (*See* D's Ex. 4 at 2; D's Ex. 7 at 2; SRO Decision at 23 (CSE had "willingness to reconvene and address the parents' concerns and to make changes to the IEP").)  While Plaintiffs argue that the changes made here were not "material," they have offered no support for that assertion, other than their own opinion.  And while the *P.F.* court stated that the district there failed to implement "significant changes" or "material changes," suggesting that some minor changes may have been made, it did not explain what those changes were or how it determined which changes should be considered material.  Here, I defer to the SRO's educational expertise in determining that the CSE made changes to the IEP that were responsive to the Plaintiffs' concerns.  (*See* SRO Decision at 23.)  Accordingly, *P.F.* does not compel a different result, and Plaintiffs argument that they were effectively minimized is not supported by the evidence.

Next, Plaintiffs argue that the District never treated a residential program as a viable option and failed to take into account S.S.'s unique needs.  (Ps' Mem. at 7, 9, 11.)  But this argument also falls short.  "Those courts that have found predetermination have relied on evidence that the school district had an unofficial policy of refusing certain support programs,

independently proposed an IEP placing the child in a preexisting program, or wrote letters stating its intent to change a student's placement before developing an IEP." *J.G.*, 777 F. Supp. 2d at 649 (citations omitted).  Regarding the former, courts have found predetermination where there is evidence that a district refuses certain programs for all students, not just the student in question.  *See, e.g.*, *E.M. v. N.Y.C. Dep't of Educ.*, 213 F. Supp. 3d 607, 614 (S.D.N.Y. 2016) ("The Court holds that [student] was denied a FAPE on procedural grounds because the CSE would apparently never recommend a 12:1 class for a tenth-grade student like [student] even if all evidence supported this type of placement.").  While Plaintiffs allege that the CSE never credibly considered a residential program as applied to S.S., there is no indication that the District refuses generally to recommend residential placements.  *M.H.*, 685 F.3d at 257 (2d Cir. 2012) (no predetermination where "[plaintiff's] testimony does not tend to establish that the district would not consider a 1:1 placement in an appropriate case").  Next, there is evidence that the District considered a more restrictive program – *i.e.*, the more self-contained local program – but found that that program was too restrictive for S.S.'s needs.  (Tr. at 686:13-687:8.) Accordingly, it was logical that the District did not then proceed to consider an even more restrictive, private, out-of-state placement.  Finally, there is no evidence that anyone in the District wrote letters or otherwise made commitments regarding S.S.'s placement prior to developing her IEP.

Plaintiffs' next argument – that the District impermissibly considered preexisting investment in its ISP program in recommending it for S.S. – also fails.  Plaintiffs argue that the District "acknowledg[ed] that it built its program to benefit the maximum number of students, and the IHO acknowledged that this blinded the CSE members and prevented them from taking a careful look at S.S.'s unique needs," based on McGuffog's testimony that "'[o]ther districts

won't spend the money that we're spending on having the teacher go into a special class, and that's why people pay tuition dollars to come to this school.'" (Ps' Mem. at 8-9 (quoting Tr. at 702:16-19).)  This argument is rejected.  First, the IHO did not say anything about preexisting investment in the ISP program.  Second, McGuffog's testimony came in response to a question about consultant teachers in the District, and McGuffog was explaining that while consultant teachers in most districts are used for students with average or close to average ability, in the District, consultant teachers are used in a more hands-on capacity, which made the ISP a sought-after program even for out-of-District students who pay tuition.  (*See* Tr. at 702:11-22.)  There is simply nothing in that testimony to suggest that investment into the ISP program was a motivating factor in recommending it for S.S.

Finally, Plaintiffs argue that *Deal v. Hamilton County Board of Education*, 392 F.3d 840 (6th Cir. 2004), a seminal case in which the Sixth Circuit found a school district to have engaged in impermissible predetermination, "presents striking parallels" to the instant case. (Ps' Mem. at 7.)  I disagree.  First, as noted above, cases that find predetermination often do so where there is evidence that the district would never consider the parents' recommendation as a viable option. Indeed, that was the case in *Deal*, where the court found that "[t]he facts of this case strongly suggest that the School System had an unofficial policy of refusing to provide one-on-one ABA programs and that School System personnel thus did not have open minds and were not willing to consider the provision of such a program."  *Id.* at 858.  Here, as noted, the Plaintiffs have not established or presented any evidence to suggest that the District had an unofficial policy of refusing to provide residential placements.  Further, in *Deal*, there was no evidence that the parents contributed to the IEPs, *id.* at 858-59 (district "unable to point to any evidence . . . that the [parents] contributed to the operative portions of the IEP – that their opinions were

considered in determining the services that would be provided to [student]"), while here, the CSE considered witnesses presented by Plaintiffs, made changes to both years' IEPs in response to Plaintiffs' concerns, and changed S.S.'s classification based on Gottesfeld's report.[15]

While the Court sympathizes with the Parents and understands their frustration after having their proposal denied two years in a row, "[t]he mere fact that the CSE's ultimate recommendation deviated from their express request . . . does not render the Parents 'passive observers' or evidence any predetermination on the part of the CSE." *B.K.*, 12 F. Supp. 3d at 359. And while Plaintiffs' advocacy for their child is admirable, "[w]hat the [IDEA] guarantees is an appropriate education, not one that provides everything that might be thought desirable by loving parents." *Walczak*, 142 F.3d at 132 (internal quotation marks omitted).

Accordingly, the Court affirms the SRO's decision regarding predetermination, and grants summary judgment in favor of Defendant on that issue.

---

[15] The other cases on which Plaintiffs rely are similarly unpersuasive. *W.G. v. Board of Trustees of Target Range School District No. 23*, involved a laundry list of procedural errors committed by the district, which together established that the district did not provide the student a procedurally sound FAPE. 960 F.2d 1479, 1481, 1487 (9th Cir. 1992), *superseded in part by statute as recognized in J. K. v. Missoula Cty. Pub. Sch.*, 713 F. App'x 666 (9th Cir. 2018) (unpublished decision). In *N.L. ex rel. Mrs. C. v. Knox County School*, the court did not determine whether procedural violations occurred, but noted that it doubted any technical violations occurred where a parent went to IEP meetings and voiced concerns. 315 F.3d 688, 695 (6th Cir. 2003). In *Spielberg ex. rel. Spielberg v. Henrico County Public School*, school board officials sent a number of letters back and forth prior to developing the IEP, and the letters established that the student's placement was decided before the IEP was developed. 853 F.2d 256, 258 (4th Cir. 1988). In *E.H. v. New York City Department of Education*, the "SRO failed to analyze the record to answer the relevant question of whether the Parent was denied meaningful opportunity to participate." 164 F. Supp. 3d 539, 553 (S.D.N.Y. 2016). And in *J.E. v. New York City Department of Education*, "the SRO did not rely on the record to satisfactorily explain why the parent was denied an opportunity to meaningfully participate in a conversation about the appropriate teacher to student ratio for the child's education, and its review was neither thorough nor careful," 229 F. Supp. 3d 223, 236 (S.D.N.Y. 2017) (internal quotation marks omitted), meaning that the SRO decision was not entitled to deference – in contrast to the SRO decision here, which contained a thorough and detailed analysis of the essential issue.

###### B.      Whether the SRO Erred by Failing to Consider Substantive Violations

Plaintiffs argue, among other things, that the SRO erred by failing to consider whether the District provided a substantive FAPE to S.S.  (P's Mem. at 11-15.)  Defendant argues in response that the Court does not have subject matter jurisdiction over Plaintiffs' claims to that end, and thus those claims cannot be considered.  (Doc. 35 ("D's Reply") at 8-10.)  Defendant, however, did not make any subject matter jurisdiction argument in its opening brief.  Thus, Plaintiffs asked on April 14, 2020, for a chance to sur-reply to address Defendant's new legal argument, (Doc. 40), to which Defendant replied on April 15, 2020, that its reply brief "contained no new legal claims or allegations," (Doc. 41 at 3).

I do not understand how Defendant can say it did not raise a new legal issue, as it said nothing of subject matter jurisdiction in its opening brief and then argued lack of subject matter jurisdiction in its reply brief.  To the extent Defendant argues in its April 15 letter that it was simply responding to Plaintiffs' memorandum, not setting forth new grounds, that argument seems disingenuous.  From the inception of this case Plaintiffs alleged that the SRO erroneously held that Plaintiffs waived their substantive FAPE claims by failing to cross-appeal the IHO's decision to not address those claims (Plaintiffs' first claim) and that the District failed to offer S.S. a substantive FAPE for the 2016-17 and 2017-18 school years (Plaintiffs' fifth claim). (Compl. ¶¶ 182-195, 225-241.)  Defendant moved for summary judgment, seeking to dismiss Plaintiffs' entire Complaint, (D's Mem. at 11), but provided no grounds as to dismiss Plaintiffs' first and fifth claims until their reply brief, in which it said the Court lacks subject matter jurisdiction to adjudicate those claims.  Accordingly, it seems entirely proper for this Court to allow Plaintiffs to respond to Defendant's new argument in reply.  That said, Plaintiffs need not file another brief, as Plaintiffs cogently laid out their arguments in two letters, (Docs. 40, 42), and because the Court is largely finding in their favor on that issue.  The Court finds that the

30

SRO erred by failing to consider Plaintiffs' claims that the District failed to provide S.S. with a substantive FAPE for the 2016-17 and 2017-18 school years.

The SRO explained that "the parents raised a number of claims in their due process complaint notice that were not addressed by the IHO." (SRO Decision at 13.) Indeed, because the IHO found that the District predetermined S.S.'s placement, and thus committed a procedural violation of the IDEA, the IHO found it unnecessary to address Plaintiff's substantive FAPE claims. The SRO explained that "[t]he [P]arents have not cross-appealed from the IHO's failure to address those claims and have not otherwise asserted them on appeal as additional bases for upholding the IHO's determination that the [D]istrict failed to offer the student a FAPE," and therefore the SRO found that any substantive FAPE claim (as well as some other procedural claims that the Plaintiff did not cross-appeal), were waived. (*Id.* at 13-14.)

What the SRO failed to consider, however, was the fact that Plaintiffs were not aggrieved by the IHO's decision to not address certain issues raised in the DPC. While the SRO was correct that the applicable regulations provide that "[a] respondent who wishes to seek review of an impartial hearing officer's decision may cross-appeal from all or a portion of the decision by setting forth the cross-appeal in an answer" and must "clearly specify the reasons for challenging the impartial hearing officer's decision, identify the findings, conclusions, and orders to which exceptions are taken, or the failure or refusal to make a finding, and . . . indicate the relief sought by the respondent," 8 N.Y.C.R.R. § 279.4(f), she failed to take into account the overwhelming authority in this Circuit that has found that a non-aggrieved party's failure to cross-appeal an unaddressed issue does not constitute a waiver, *see NB & CB v. N.Y.C. Dep't of Educ.*, No. 15-CV-4948, 2016 WL 5816925, at *4 (S.D.N.Y. Sept. 29, 2016) ("The DOE is correct that because the IHO did not address the allergy claims, the DOE was not required to cross-appeal on those

claims to the SRO."), *aff'd sub nom. N.B. v. N.Y.C. Dep't of Educ.*, 711 F. App'x 29 (2d Cir.

2017) (summary order); *W.W. v. N.Y.C. Dep't of Educ.*, No. 12-CV-7196, 2014 WL 1330113, at

*15 (S.D.N.Y. Mar. 31, 2014) ("The Court agrees that Plaintiff was not obligated to cross-appeal

the IHO's decision because she was not aggrieved by it."); *T.G. ex rel. R.P. v. N.Y.C. Dep't of

Educ.*, 973 F. Supp. 2d 320, 337-38 (S.D.N.Y. 2013) ("Most judges in this district have

concluded that when an IHO rules in favor of a parent on some grounds, but fails to reach other

grounds alleged in the parent's due process complaint, the parent's failure to cross-appeal those

issues to the SRO does not result in their waiver.") (collecting cases); *FB v. N.Y.C. Dep't of

Educ.*, 923 F. Supp. 2d 570, 588 (S.D.N.Y. 2013) ("Parents' failure to cross-appeal an issue not

addressed by the IHO one way or the other does not and should not prevent that issue from being

preserved for review by the SRO."); *J.M. v. N.Y.C. Dep't of Educ.*, No. 12-CV-8504, 2013 WL

5951436, at *21-22 (S.D.N.Y. Nov. 7, 2013) ("As other courts in this District have recognized . .

. a plaintiff's failure to cross-appeal claims not addressed by the IHO where the plaintiff is not

'aggrieved' neither results in a waiver of those claims nor gives an SRO *carte blanche* to ignore

those claims on appeal. . . .   Plaintiffs were not aggrieved by the failure to resolve the

Unaddressed Claims, and thus were not required to cross-appeal.").  Indeed, it is entirely logical

that a parent would not want to identify any issues or mistakes in an IHO's decision if that

decision came out in favor of the parent, and the Court can think of no logical support for a

requirement that parties pursue an appeal when they are content with the decision.

 Defendant argues that the Court "has no subject-matter jurisdiction to consider claims on

appeal from the decision of the SRO that the SRO held to be abandoned by a party who failed to

raise such claims through an answer or cross-appeal of an IHO decision."  (D's Reply at 9.)  I

agree to an extent – that the Court should not decide substantive FAPE claims in the first

instance if not taken up by the IHO or SRO – but I disagree that I cannot find that the SRO erred in considering certain arguments waived. Indeed, if Defendant's position were right, none of the cases cited above would have come about. And the cases to which the Defendant cites are inapposite. In *AR ex rel. MR v. Katonah Lewisboro Union Free School District*, an IHO concluded that a district provided a student with a FAPE for each year in question and thus – even though the plaintiffs there had met their burden of showing that the private school met the student's needs and that equitable considerations generally weighed in favor of providing Plaintiffs with tuition reimbursement – the parents were not entitled to a tuition reimbursement. No. 18-CV-9938, 2019 WL 6251196, at *6 (S.D.N.Y. Nov. 21, 2019). The parents and the district each then cross-appealed from the IHO's decision, but the parents did not state on appeal to the SRO that the district had failed to set adequate goals for the student, and therefore any argument to that end was waived. *Id.* at *12 n.8. In other words, an aggrieved parent appealed an IHO's decision, but only on certain grounds, and the omitted grounds were then considered waived. That is nothing like the case at hand, where the Parents did not appeal or cross-appeal to the SRO at all, as they had not been aggrieved by the IHO decision, which awarded them the exact relief they sought. Accordingly, *A.R.* does not help the District here.

In *M.C. ex rel. of J.C. v. Mamaroneck Union Free School District*, the other case Defendant cites, the parents cross-appealed from an IHO's decision in which the IHO found against them. No. 17-CV-1554, 2018 WL 4997516, at *10 (S.D.N.Y. Sept. 28, 2018). But the statement on cross-appeal was very vague and "fail[ed] to identify the precise rulings presented for review and it fail[ed] to cite to the pertinent portions of the record on appeal, as required in order to raise an issue on cross-appeal." *Id.* at *23. Again, that case is nothing like the case presented here. Plaintiffs here had no need to appeal anything to the SRO, as they obtained the

relief they sought before the IHO.  The Court will not find that a Plaintiffs' failure to cross-appeal from a victory renders their claims waived.  *See D.N. v. N.Y.C. Dep't of Educ.*, 905 F.Supp.2d 582, 588 (S.D.N.Y.2012) ("Parent received precisely the relief she sought: reimbursement for the Student's unilateral placement at the Rebecca School.  Therefore, the Parent was not aggrieved, and she 'had neither the responsibility nor the right' to cross-appeal any portions of the IHO's decision.") (quoting *Antkowiak ex rel. Antkowiak v. Ambach*, 838 F.2d 635, 641 (2d Cir. 1988)); *see also Y.S. v. N.Y.C. Dep't of Educ.*, No. 12-CV-2590, 2013 WL 5722793, at *7 (S.D.N.Y. Sept. 24, 2013) ("parents were not aggrieved, since the Hearing Officer found that they were entitled to reimbursement" and thus had no "responsibility nor the right" to cross-appeal those claims) (internal quotation marks omitted).  Accordingly, the SRO erred in considering Plaintiff's substantive FAPE claims waived, and that portion of her decision is vacated and reversed.

Instead of deciding the substantive FAPE issues without the benefit of an IHO's or SRO's decision on the relevant issues, however, I remand this case to the IHO to adjudicate Plaintiffs' substantive FAPE claims.  *See W.W.*, 2014 WL 1330113, at *15 ("[W]ithout prior guidance from the state administrative authorities, the Court declines to decide these two remaining issues at this time and remands to the IHO to decide in the first instance."); *J.F.*, 2012 WL 5984915, at *10 (remanding to IHO when neither IHO nor SRO had reviewed remaining issues); *see also F.B.*, 923 F.Supp.2d at 590 (remanding to SRO); *D.N.*, 905 F.Supp.2d at 588-89 (S.D.N.Y. 2012) ("rather than reaching the merits of the unreviewed claims, we remand this matter to the SRO").

## IV.   CONCLUSION

Based on the foregoing, Defendant's motion is GRANTED IN PART and DENIED IN PART, and Plaintiffs' cross-motion is GRANTED IN PART and DENIED IN PART.  The SRO correctly found that the District did not engage in predetermination, and her decision to that end is affirmed.  The SRO did, however, err in finding Plaintiffs to have waived their substantive FAPE claims by not cross-appealing from the IHO's decision to not address them.  Accordingly, Plaintiffs' substantive FAPE claims are remanded to the IHO to decide in the first instance.  The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 23, 31), and close the case.

**SO ORDERED.**

Dated:  August 10, 2020
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.